952 F.2d 1274
 57 Fair Empl.Prac.Cas. (BNA) 1518,
58 Empl. Prac. Dec. P 41,313
Sheila PEARSON, Plaintiff-Appellant,
v.
MACON-BIBB COUNTY HOSPITAL AUTHORITY; Medical Center of
Central Georgia and Damon H. King, Individually and in his
official capacity as the Administrator of the Medical Center
of Central Georgia, Defendants-Appellees.
 No. 90-8966.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 3, 1992.
 
 Christopher Coates, Milledgeville, Ga., for plaintiff-appellant.
 H. Lane Dennard, Jr., King & Spalding, Kirk D. McConnell, Margaret H. Campbell, Ogletree, Deakins, Nash, Smoak, & Stewart, Atlanta, Ga., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Georgia.
 Before TJOFLAT, Chief Judge, BIRCH, Circuit Judge, and HILL*, Senior Circuit Judge.
 BIRCH, Circuit Judge:
 
 
 1
 This appeal is from the grant of summary judgment by the United States District Court for the Middle District of Georgia, in favor of defendants in a suit brought by an employee of a publicly funded hospital who was allegedly subject to discrimination in a discharge from employment. For the reasons that follow, we find that material questions of fact remain for resolution with respect to the issue of equitable tolling of the prescribed filing period, as well as the merits of the plaintiff-appellant's claims under Title VII, 42 U.S.C. §§ 2000e to 2000e-17 (1988), and the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1; see 42 U.S.C. § 1983 (1988). We REVERSE and REMAND for further proceedings.
 
 I. BACKGROUND
 
 2
 Appellant Sheila Pearson, who is a black person, was employed at the Medical Center of Central Georgia from 1976 until her discharge in January 1986. At the time of the incident precipitating her termination, appellant held the position of senior staff nurse, and performed work as a charge nurse in the operating room ("O.R."). Her duties included preparing the O.R. for surgery, coordinating the availability of staff needed for procedures, and checking the cleanliness of the O.R. area. Due to the higher level of her position, appellant was also called upon to perform in a supervisory capacity.
 
 
 3
 Appellant's termination stemmed from an event involving several nurses in which a package of contaminated surgical instruments was left untended in the O.R. area. On the afternoon of September 13, 1985, an O.R. technician assisted in a surgical procedure that yielded a bundle of contaminated instruments, then failed to remove the instruments to the O.R. sterilization area (as was her duty) in her haste to assist in another procedure. Another nurse, serving as "outside circulator" during the surgical procedure subsequently enclosed the instruments in a sheet but also failed to remove them for cleaning. A third nurse, working as charge nurse during the evening of the same day, failed to discover the instruments during her rounds of the O.R. Hence, the instruments were left in the hallway outside the O.R. and remained there until the 9:00 p.m. to 9:00 a.m. shift worked by the appellant. Appellant, too, despite having a duty to make rounds in the O.R., neglected to discover and remove the instruments during her shift, and they remained in their inappropriate location until discovered by a nurse working a shift on the morning of September 14.
 
 
 4
 As a result of the incident, appellant and the other three nurses, who are white persons, received oral warnings for neglect of duty from their immediate supervisor, Mary Freeman. Freeman issued this reprimand to appellant in a September 19 meeting. Not long after receiving Freeman's reprimand, appellant attended a seminar in which she criticized the failure of her superiors to adequately supervise the cleaning responsibilities of the O.R. nurses. Also shortly after her meeting with Freeman, the appellant submitted a written response to Freeman's reprimand dated October 6, in which she asserted that ultimate blame for the incident lay with the O.R. technician and urged that the assignment of O.R. duties be clarified in the future. Meanwhile, Freeman discussed the underlying incident, as well as general complaints about appellant's disruptive behavior in the workplace with an Assistant Administrator, Sylvia Bond, who agreed with Freeman that the appellant should be terminated from O.R. duties and directed Freeman to meet with the Director of Medical-Surgical Nursing, Lavonne Harn. On the basis of Freeman's criticisms of appellant, Harn and Freeman decided to require appellant to choose between resigning or transferring to another section of the hospital. Also at some point during this time frame, Bond met with Daymon King, Administrator of the Medical Center, and briefed him on the planned action against appellant. Beyond the initial oral warnings given in September, no equivalent action was taken against any of the other nurses involved in the September 13 incident.
 
 
 5
 In accordance with their determination, Freeman and Harn met with appellant on October 16 to notify her of their decision and to explain the options available to her, informing her that she could resign to seek employment at another hospital, apply for a transfer within the Medical Center, or, in the event she refused either option, be terminated. Appellant informed Freeman two days later that she wished to transfer to another hospital section. Appellant then sought a position in the hospital's Emergency Center but was told that no opening was available in that area. When offered a job in one of the Urgent Care Centers, the appellant declined the position due to time conflicts that would arise with her responsibilities at home.
 
 
 6
 Thereafter, appellant took a medical leave of absence from the Medical Center and, after her leave and benefit time was exhausted, was ultimately administratively terminated on January 21, 1986.
 
 
 7
 On April 28, 1986, 194 days after notice of termination, appellant filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC"). Therein she named as defendants the Medical Center, the Macon-Bibb County Hospital Authority (a public entity that operates the Medical Center), and King, individually and officially in his capacity as Administrator of the Medical Center (having ultimate responsibility for personnel decisions). In her complaint, Pearson alleged violations of an asserted federal proscription under 42 U.S.C. § 1981 (1988) of discriminatory discharge in private employment contracts, procedural due process rights, substantive due process rights, First Amendment rights, Title VII, and the Fourteenth Amendment right of equal protection. On each of these claims the district court granted defendant-appellees' motion for summary judgment.[1] We address each issue in turn, undertaking a plenary review of whether there is no genuine issue as to any material fact and whether the appellees are entitled to judgment as a matter of law. Carlin Communication v. Southern Bell, 802 F.2d 1352, 1356 (11th Cir.1986).
 
 II. DISCUSSION
 A. The 42 U.S.C. § 1981 Claim
 
 8
 In granting summary judgment below, the district court addressed the merits of Pearson's claims under 42 U.S.C. § 1981 for discriminatory discharge.[2] Our review of the district court's decision, however, need not reach the merits, as appellant's § 1981 claim fails legally under the Supreme Court's intervening ruling in Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).
 
 
 9
 In Patterson, the Court addressed the scope of § 1981 as applied to employment contracts, and held that
 
 
 10
 § 1981 ... covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process.
 
 
 11
 491 U.S. at 179-80, 109 S.Ct. at 2374. Hence, claims for discriminatory discharge are not cognizable under § 1981. Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1520 (11th Cir.1991). Thompkins v. Dekalb County Hosp. Auth., 916 F.2d 600, 601 (11th Cir.1990) (per curiam). The clear mandate of Patterson, moreover, applies retroactively to cases like the present case, in which a final judgment had not been reached at the time of the Patterson decision. Weaver, 922 F.2d at 1519. Accordingly, we affirm the district court's grant of summary judgment on appellant's § 1981 claim in light of Patterson.[3]
 
 B. The First Amendment Claim
 
 12
 Appellant's complaint also asserted a free speech claim, alleging that the Medical Center's action against the appellant was taken in retaliation for comments critical of overall operating room cleanliness and her supervisors' assignment of cleaning responsibilities. On appeal, Pearson contends that the district court erred in ruling that she failed to create any genuine issue of material fact as to the elements set forth in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Connick limits First Amendment review of a government employer's dismissal of a worker to those cases in which the underlying expression can "be fairly characterized as constituting speech on a matter of public concern...." Id. at 146, 103 S.Ct. at 1690. Appellant argues that her remarks should be accorded First Amendment protection, because they touched on O.R. conditions that were potentially hazardous to patients and addressed deficiencies in the functioning of a publicly funded facility--both matters of some public significance.[4]
 
 
 13
 The threshold question of whether such speech "relate[s] to matters of public concern is a question of law, and is therefore, readily susceptible to disposition on summary judgment." Ferrara v. Mills, 781 F.2d 1508, 1515 (11th Cir.1986). As summary judgment is not precluded by any factual questions about Pearson's subjective, internal motivation in speaking on these matters, we accordingly inquire into the content, form, and context of Pearson's complaints in order to determine whether her comments regarding O.R. conditions--hence pertaining to matters clear public significance--arose in a context that renders First Amendment protection appropriate. Id. Based on the undisputed facts, we agree with the district court's conclusion that the examples of critical speech cited by appellant arose in a context that forecloses a free speech claim. In Connick, the Court taught that, absent extraordinary circumstances, an employee's speech is beyond the protection of the First Amendment when the "employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest...." Connick, 461 U.S. at 147, 103 S.Ct. at 1690. In the present case, this lesson clearly applies. The record discloses that Pearson's complaints primarily pertained to the assignment of cleaning responsibilities in the O.R. and the allocation of blame among the nurses responsible for O.R. conditions on those occasions when cleaning duties were neglected. It was only incident to speaking on these concerns that appellant's remarks touched on conditions that might be potentially hazardous to patients. Appellant's complaints, furthermore, were in large measure conveyed in light of a reprimand, still fresh, which appellant believed unfairly attributed responsibility to her for poor O.R. conditions. In essence, Pearson's comments concerned the circumstances of her own employment.
 
 
 14
 Indeed, authorities relied upon by the appellant in support of her claim illuminate this distinction between public concern and personal interest. In Maples v. Martin, 858 F.2d 1546 (11th Cir.1988), for example, this court cited as a crucial factor the effect a report had on the "public's perception" of an academic institution. We held in Maples that a report prepared by university professors and highly critical of their academic department's practices, when the professors published and mailed the report to an outside accreditation board, constituted speech on a matter of public concern. Id. at 1553-55. The plaintiff in Morales v. Stierheim, 848 F.2d 1145 (11th Cir.1988), cert. denied, 489 U.S. 1013, 109 S.Ct. 1124, 103 L.Ed.2d 187 (1989) likewise met the Connick public concern requirement when his speech criticized an elected official and defended his own office's conduct against public criticisms lodged by that official. Id. at 1149. By contrast, the private and self-interested character of Pearson's speech in no way draws the public at large or its concerns into the picture.
 
 
 15
 In the context presented here, neither generalized health concerns nor "a supposed popular interest in the way public institutions are run," Ferrara, 781 F.2d at 1516, is sufficient to create a material issue as to whether Pearson's comments pertained to a matter of public concern within the meaning of Connick. Summary judgment as to this issue was therefore proper.
 
 C. The Title VII Claim
 
 16
 Appellant's Title VII claim was defeated not on the merits, but rather on the basis of appellant's failure to file her claim within the statutorily prescribed period. Title VII provides that a person wishing to file a discrimination claim with the EEOC must do so within 180 days of the alleged unlawful employment practice. 41 U.S.C. § 2000e-5(e). The district court entered summary judgment in view of this filing requirement, noting that Pearson filed her claim more than 180 days after the October 16 meeting in which she was informed of the Medical Center's decision to require her to resign, transfer, or be terminated.
 
 
 17
 Pearson argues that the precise "unlawful employment practice" at issue occurred when she was terminated in January--a formulation that brings her claim well within the filing deadline. In light of Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) and Chardon v. Fernandez, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam), however, this argument fails. In those cases, the Supreme Court held that adverse tenure decisions by universities triggered the running of the statutory period, notwithstanding the fact that the professors involved were offered terminal employment contracts that delayed their ultimate discharge. To determine the triggering of the statute, "the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful." Chardon, 454 U.S. at 8, 102 S.Ct. at 29. Here, the discriminatory decision, if any, occurred and was communicated to the appellant on October 16.
 
 
 18
 In short, the equivocal character of the adverse employment decision of October 16 does not deprive that decision of its status as the operative act. Thus, even though the termination of Pearson's employment was not inevitable upon the passing of a designated date (as it was for the academicians in Ricks and Chardon ) the distinctive fact that she was offered an opportunity to seek a transfer is relevant only to the availability of equitable modification of the deadline, and not the determination of when the alleged underlying discriminatory act occurred.
 
 
 19
 In connection with the propriety of an equitable tolling of the running of the time period, appellant principally directs our attention to Cocke v. Merrill Lynch & Co., 817 F.2d 1559 (11th Cir.1987) (per curiam). In Cocke, this circuit found arguable merit to an equitable tolling argument in facts similar to the instant case. The age discrimination plaintiff in Cocke filed an untimely claim after receiving a notice of termination in which the plaintiff's manager confirmed that he would pursue other positions for the plaintiff within the company. Reversing summary judgment as to the issue of equitable tolling, this court held that
 
 
 20
 while the employer is actively trying to find a position within the company for the employee, the ... filing period ... is equitably tolled until such time as it is or should be apparent to an employee with a reasonably prudent regard for his rights that the employer has ceased to actively pursue such a position.
 
 
 21
 * * * * * *
 
 
 22
 It is too much for the law to expect an employee to sue his employer for age discrimination at the same time he is led to believe the employer is trying to place him in another job.
 
 
 23
 Id. at 1561-62. The instant case, in which appellant was invited to seek a transfer as an alternative to termination, cannot in principle be distinguished from Cocke.[5] Accordingly, we find that Cocke mandates trial on the issue of the availability of equitable tolling on these facts in accordance with settled standards. See generally Reeb v. Economic Opportunity Atlanta, Inc., 516 F.2d 924, 929-31 (5th Cir.1975).
 
 
 24
 Also relevant to the survival of appellant's Title VII action is the district court's determination, in considering her § 1981 and § 1983 claims, that she failed to establish that she was similarly situated with the three white employees involved in the contaminated instruments incident (none of whom were discharged). A Title VII plaintiff may make out a prima facie case by a showing of disparate treatment among similarly placed employees. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 282-83, 96 S.Ct. 2574, 2579-80, 49 L.Ed.2d 493 (1976). The district court ruled that appellant had failed to meet this threshold requirement, inasmuch as she was charged with greater overall responsibilities than the other nurses and therefore was not similarly situated.
 
 
 25
 Based on the precedent of Rhode v. K.O. Steel Castings, Inc., 649 F.2d 317 (5th Cir. Unit A June 1981), however, we disagree with the district court's analysis. The Rhode court cautioned against an emphasis on formal differences in job duties:
 
 
 26
 What is relevant is that two employees are involved in or accused of the same offense and are disciplined in different ways. Differences in job status and skill may well have an impact on the second phase of proof [in which the employer must produce a legitimate reason for the different treatment] but they should not defeat a prima facie case....
 
 
 27
 Id. at 322. Given that all four nurses involved in the neglect of the contaminated instruments on September 13 were responsible for the cleanliness of the O.R. area and noting that the hospital retained a white nurse who had initial and primary responsibility for the instruments in question, we cannot in reason hold that appellant's higher employment position in itself defeated her prima facie case.
 
 
 28
 Our examination of the record also precludes summary judgment on the ground that appellees have proffered legitimate, non-disciminatory reasons for appellant's discharge. "[S]ummary judgment is not a proper vehicle for resolving claims of employment discrimination which ... turn on an employer's motivation and intent." Delgado v. Lockheed-Georgia Co., 815 F.2d 641, 644 (11th Cir.1987). While appellees' offer much in explanation for the adverse employment decision in question, conflicting evidence in the record nevertheless leaves material issues of fact for resolution.[6]D. The Equal Protection Claim
 
 
 29
 For these same reasons, we disagree with the district court's disposition of appellant's claim for damages under the Equal Protection Clause pursuant to 42 U.S.C. § 1983. In an action proceeding under both Title VII and § 1983, the substantive elements of proof are the same under both statutes. Palmer v. District Bd. of Trustees of St. Petersburg Junior College, 748 F.2d 595, 596 n. 2 (11th Cir.1984). Therefore, the existence of genuine issues of material fact as to whether similarly situated white employees were treated differently from appellant precludes summary judgment on this aspect of appellant's § 1983 claim in addition to the Title VII claim.
 
 
 30
 Appellees, seeking affirmance on another ground, rely on the principle that an isolated employment decision by a public entity official may expose the entity itself to liability under § 1983 only when that decision was governed by institutional policy. See City of St. Louis v. Praprotnik, 485 U.S. 112, 122, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988). It is "assumed that an unconstitutional governmental policy c[an] be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." Id. at 123, 108 S.Ct. at 923; Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); cf. Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1977) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Here, appellant failed to avail herself of an appeal through the Medical Center's Employee Grievance Procedure, in which Administrator King would have reviewed his subordinates' employment decision. Noting that it is undisputed that King was the final policymaker in employment matters, the appellees argue that King himself at no point rendered a final decision on appellant's case, and therefore cannot be charged with the decision.
 
 
 31
 The record discloses, however, a genuine issue as to King's role in the adverse employment decision. Notwithstanding the appellant's failure to appeal through the grievance procedure, there remains a material question as to whether King ratified the decision ab initio. If King, as final policymaker and the ultimate arbiter of employment appeals, did in fact ratify the action against appellant, appellees cannot now be heard to complain that appellant failed to avail herself of a process leading back to the same final decisionmaker.[7] King's deposition reveals that Assistant Administrator Sylvia Bond discussed the action with him before communicating the decision to the appellant. R1-9-12-13. Bond's affidavit, moreover, reveals her recollection that King expressed agreement with the proposed action in the same meeting. R1-13 (Bond Aff.-3). So far as it can be shown that King exercised his authority by ratifying the decision, appellant's equal protection claim will survive under Praprotnik.[8] Hence, summary judgment is precluded by genuine issues that remain with respect to King's possible ratification of the employment decision against appellant.[9]
 
 III. CONCLUSION
 
 32
 For the foregoing reasons, we REVERSE the district court's grant of summary judgment with respect to appellant's claims under Title VII and the Equal Protection Clause and REMAND for resolution of these claims.
 
 
 
 *
 Judge James C. Hill was a member of the panel which heard oral argument but recused himself following oral argument and did not participate in this decision. The case is decided by a quorum. See 28 U.S.C. § 46(d)
 
 
 [1]
 In her brief, appellant does not assign error to the district court's determination with respect to the procedural and substantive due process claims. The district court determined that appellant was an at-will employee, and as such lacked a property interest in her job. Thus, she had no right to procedural or substantive due process in connection with her discharge. Hatcher v. Bd. of Pub. Educ. and Orphanage, 809 F.2d 1546, 1548-49 (11th Cir.1987); cf. Barnett v. Housing Auth., 707 F.2d 1571, 1577-78 (11th Cir.1983)
 
 
 [2]
 Section 1981, as interpreted in Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), "prohibits racial discrimination in the making and enforcement of private contracts." Id. at 168, 96 S.Ct. at 2593
 
 
 [3]
 Also on point is Supreme Court precedent barring claims for damages under § 1981 against public entities. The Supreme Court has ruled that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units...." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733, 109 S.Ct. 2702, 2721, 105 L.Ed.2d 598 (1989). Owing to the clear effect of Patterson, however, we need not seek support in that holding in affirming summary disposition of appellant's § 1981 claim
 
 
 [4]
 We note that the appellant's complaint in district court specifically alleged a violation of the right to petition the government for redress of grievances. Since the arguments below and before this court have taken up the free speech issue instead of that right, we, like the district court, will overlook the appellant's mischaracterization of her claim in the original complaint
 
 
 [5]
 The district court distinguished the present case from Cocke on grounds that "[e]ven if the plaintiff had transferred to a new job the alleged discriminatory act would still have occurred." R1-22-8. This distinction, however, does not negate the relevance of Cocke. The fact that Pearson identifies the October 16 communication of alternatives as the alleged discriminatory act ex post does not answer the relevant question: whether she reasonably believed at the time (and perhaps for some time thereafter) that she would be favorably transferred so as to obviate any discrimination charge. Disputed facts foreclose summary judgment on this question
 
 
 [6]
 Viewing the evidence in the light most favorable to the appellant, see Sweat v. Miller Brewing Co., 708 F.2d 655, 656 (11th Cir.1983), it is apparent that genuine issues remain as to whether the other nurses involved accepted responsibility and whether appellant's prior job performance was less than satisfactory. Both issues call into question the reasons for the discharge articulated by appellees
 
 
 [7]
 Praprotnik, erroneously relied upon by appellees, held that supervisors authorizing the discharge did not establish policy for the city-employer where an appeal to a distinct, higher authority (an appeals commission) was available. See Praprotnik, 485 U.S. at 127-28, 108 S.Ct. at 926-27
 Appellees' assertion that Pearson was not personally aware of King's role at the time of the decision is also unavailing. Relevant cases do not endorse an inquiry into scienter. At issue is the objective question whether King's involvement constituted an adoption of the decision by an officer with final policymaking authority. See Monell, 436 U.S. at 690, 98 S.Ct. at 2036.
 
 
 [8]
 These same facts of record raise genuine issues of fact which prevent the grant of summary judgment to appellee King in his individual capacity
 An equal protection claim will prevail only upon a showing of intentional discrimination. Personnel Adm'r v. Feeney, 442 U.S. 256, 276, 99 S.Ct. 2282, 2294, 60 L.Ed.2d 870 (1979). Given that the wrongfulness of an act of disparate treatment arises from discriminatory motive, the record leaves room for doubt whether King's actions will support § 1983 liability at trial. Nonetheless, summary disposition of this genuine issue is, on the record, inappropriate.
 In passing, we note that the Supreme Court, with a recent decision, squarely confirmed that a state official may be held personally liable for damages under § 1983 for employment decisions made in his official capacity. Hafer v. Melo, --- U.S. ----, ----, 112 S.Ct. 358, 362-63, 116 L.Ed.2d 301 (1991).
 
 
 [9]
 Appellees urge us to dispose of this question at summary judgment, relying on the Praprotnik plurality's instruction that the determination of a municipality's "power structure," i.e., the determination of where policymaking authority lies, is a question of state law. Praprotnik, 485 U.S. at 124 n. 1, 108 S.Ct. at 924 n. 1. Here, there is no dispute on the legal conclusion that final authority (for Praprotnik analysis purposes) is reposed in King. It is the factual issue of whether King ratified the adverse employment decision in this case that renders summary judgment inappropriate