**William D. SCALA, Plaintiff,**

v.

**CITY OF WINTER PARK, a municipal corporation, Defendant.**

**No. 95–329–CIV–ORL–18.**

United States District Court,
M.D. Florida,
Orlando Division.

July 25, 1996.

Thomas J. Pilacek, Thomas J. Pilacek & Associates, Maitland, FL, for Plaintiff.

Charles Robinson Fawsett, Patrick M. Muldowney, Shutts & Bowen, Orlando, FL, for Defendant.

## ORDER

G. KENDALL SHARP, District Judge.

William D. Scala (Scala) brings the instant action against the City of Winter Park, Florida (City) pursuant to 42 U.S.C. § 1983, to redress alleged violations of the First and Fourteenth Amendments to the United States Constitution. Scala claims that his employment with the City's fire department was illegally terminated in retaliation for the way in which he exercised his rights of free speech and association. The case is presently before the court on the City's motion for summary judgment, to which Scala has responded in opposition. In support of its motion, the City argues, *inter alia*, that Scala has failed to establish a legal basis for municipal liability. To the contrary, Scala contends that the City is liable because the actions of the City officials who pushed for his discharge, on allegedly illegal grounds, constitute an official expression of City policy, custom, and usage for which the City fairly bears responsibility. Following a review of the case file and relevant law, the court concludes that the City's motion should be granted.

### I. Findings of Fact

Scala was employed by the City as a paramedic/firefighter from February 21, 1979 to June 29, 1992. Beginning 1985, Scala held the rank of lieutenant. During his years with the fire department, Scala was highly regarded by some co-workers and scorned by others due to his apparently high level of motivation and drive to improve his professional skills as well as the collective effectiveness and skills of the department. Scala was also known as one who was unafraid to speak out in favor of co-workers who he felt were being treated unfairly by the department or fellow workers. In 1989, Scala outwardly and aggressively supported mayoral hopeful Russell Troutman in his 1989 run against the eventual winner David Johnson. Scala claims that the latter two facts sparked animosity toward him which eventually resulted in an active campaign within the fire department to have him discharged.

In September 1991, Scala was charged by Battalion Chief James Knackert (Knackert) with insubordination at a fire scene. Knackert later attempted to withdraw the disciplinary complaint against Scala because he felt he had been pressured to lodge the claim in the first place. However, City Manager Anthony Barrett (Barrett) would not allow Knackert to withdraw the charge. The charge resulted in a three-day suspension as well as Scala's demotion to firefighter from his position as lieutenant.[1] Scala appealed his suspension and demotion to the City's Civil Service Board, which reversed the demotion, reinstated Scala to his previous position of lieutenant/paramedic, but imposed an additional fifteen-day suspension which made for an eighteen-day suspension in all.

After then Fire Chief Duane Mehl resigned, Barrett appointed Police Chief James Younger (Younger) to the position of Public Safety Director. As such, Younger simultaneously served as chief of the City's fire department and police department. At the time of Younger's appointment, Scala had a good relationship with Younger. However, when Younger began to romantically pursue a married, female fire inspector named Lyn Wright (Wright), Scala's relationship with Younger soured. Scala told Younger that it

---

1. Although immaterial to he court's decision today, Scala continues to deny any insubordination or misconduct.

was unwise to pursue any relationship with Wright and that if he persisted, Scala would not lie on Younger's behalf should he ever be asked about Younger's unwelcome pursuit of Wright.

Shortly after returning to work following his suspension, Scala became the subject of ten[2] disciplinary charges by his new Battalion Chief Robert Ferrell. Although Scala claims that all of the charges were either false or concerned only trivial infractions, a committee was assembled to investigate the charges. The committee was comprised of fire department personnel who allegedly disliked Scala and wished to see him out of the fire department. One of the charges involved Scala's alleged untruthfulness in a November 1991 sworn statement. Scala alleges that Younger planned to use this charge as leverage to keep Scala from revealing Younger's romantic pursuit of Wright or, if Scala persisted, to brand Scala a liar and destroy his credibility and possibly his career. Thus, Younger took personal responsibility for investigating the charge of untruthfulness.

As to the other charges, Battalion Chief Lawrence Niren, who headed the investigatory committee, recommended that Scala be found guilty and that Scala's employment be terminated. Although Younger never interviewed Scala about the untruthfulness charge, Younger advised Scala on May 28, 1992 of his proposed termination from employment based upon six of the original ten charges including the untruthfulness charge. Scala was to appear and answer the charges on June 8, 1992. Scala claims that learning of his impending dismissal caused severe depression and anxiety which required medical care.

On June 22, 1992, Wright complained to Younger about his sexual harassment of her and demanded that it cease. In response to her complaint, a meeting to discuss the charge was scheduled for July 3, 1992; the meeting was to include Wright and Younger and was to take place in Barrett's office. Scala claims that Younger, ever mindful of

Scala's pledged support for Wright, terminated Scala's employment by letter dated June 29, 1992 with Barrett's approval. The instant lawsuit rests upon Scala's claim that Younger and Barrett concocted false or trivial disciplinary charges to mask their true reason for terminating his employment: "retaliation against Scala by Younger for his truthful speech concerning Younger's sexual harassment of Wright, and retaliation by Barrett for Scala's support of Troutman in the Mayoral election." (Complaint at ¶ 35.)

## II. Conclusions of Law

Scala's complaint contains two counts, both of which are predicated upon 42 U.S.C. § 1983. In Count I, Scala alleges that the City violated his right to free speech, as conferred and guaranteed by the First and Fourteenth Amendments to the United States Constitution, by terminating his employment in retaliation for the way in which he exercised that right. Similarly, in Count II, Scala contends that the City illegally terminated his employment because of the way in which he exercised his constitutional right to free association. The City denied the allegations and has moved for summary judgment on both counts.

### A. Legal Standard for Summary Judgment

Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Material facts are those that may affect the outcome of the case under the applicable substantive law. Disputed issues of material fact preclude the entry of summary judgment; but factual disputes that are irrelevant or unnecessary will not be counted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

---

**2.** The complaint indicates that ten charges were set forth, while Scala's memorandum in opposition to the City's motion for summary judgment

states that there were nine charges leveled. (Complaint at ¶ 28; Memorandum at pg. 4.)

The moving party bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *see Matsushita Elec. Inds. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The moving party may rely solely on his pleadings to satisfy this burden. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53; Fed.R.Civ.P. 56(c). However, the non-moving party that bears the burden of proof at trial must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions that designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). If the evidence offered by the non-moving party is merely colorable ... or is not significantly probative ... summary judgment may be granted.. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). Further, summary judgment is mandated against a party who fails to prove an essential element of his case, on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### B. The Merits of the City's Motion

The City advances three legal arguments in support of its motion for summary judgment. First, the City contends that neither Scala's protected speech nor association played a substantial part in the City's decision to terminate his employment. Second, the City argues that the decision and reasons for Scala's demotion and discharge were conclusively established by the City's Civil Service Board when it reviewed the decisions and may not now be relitigated. Finally, the City posits that its liability for Scala's discharge is precluded because the discharge did not effectuate an illegal, official City policy or an unofficial City custom. Scala responded to each of the City's arguments with arguments to the contrary. Because 42 U.S.C. § 1983 (Section 1983) is the procedural gateway to Scala's substantive claims, the court will entertain the parties' arguments on that issue first.

■ While Section 1983 does not itself provide any substantive rights, it provides a conduit through which aggrieved parties may sue those persons who have trampled federal substantive rights conferred elsewhere *See* 42 U.S.C. § 1983 (1994); *accord Skinner v. City of Miami, Fla.*, 62 F.3d 344, 347 (11th Cir.1995). Generally, to succeed on a Section 1983 claim, a plaintiff must prove that the defendant acted under the color of state law to deprive the plaintiff of a right conferred by the Constitution or the laws of the United States *See White v. Scrivner Corp.*, 594 F.2d 140, 141 (5th Cir.1979) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1732, 56 L.Ed.2d 185 (1978)).

■ The United States Supreme Court has long held that municipal governments constitute "persons" amendable to suit within the meaning of Section 1983. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). To establish municipal liability a plaintiff must prove that the municipal action which spawned the claimed constitutional deprivation "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or is "visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36; *accord Free v. Granger*, 887 F.2d 1552, 1556 (11th Cir.1989). Regardless of whether the plaintiff alleges municipal liability based upon an officially promulgated policy or an unofficially adopted custom, it must be the "moving force behind the constitutional deprivation before liability will attach." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir.1985) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 819–20, 105 S.Ct. 2427, 2434, 85 L.Ed.2d 791 (1985)).

■ In the case at bar, Scala does not allege that the City maintained or operated

under a formal policy or informal custom of terminating the employment of those who exercised their First Amendment rights in a manner inconsistent with the views of the City. Rather, Scala seeks to hold the City liable for the actions taken by Younger and Barrett to terminate his employment, which Scala claims violated his constitutional rights. (Complaint at ¶ 6, 35.) To succeed on this theory of municipal liability, Scala must necessarily prove that either Younger or Barrett possessed "final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). The action ordered in the instant case was the termination of a firefighter/paramedic's employment. Thus, if neither Younger nor Barrett possessed final policy-making authority as to that action, their decision to terminate Scala's employment is not fairly attributable to the City and would preclude its liability. Further, municipal liability cannot attach by merely proving that Younger or Barrett possessed final decision-making authority with respect to Scala's discharge. Rather, municipal liability, when sought based upon a single action, turns on whether the actor possessed final policy-making authority on the subject matter of the decision. *See id.* at 481–83, 106 S.Ct. at 1299–1300.

■ Whether a particular official possesses final policy-making authority is an issue of state law, including valid local ordinances and regulations. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989): *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123–25, 108 S.Ct. 915, 924–25, 99 L.Ed.2d 107 (1988). The local bodies of authority at issue in the instant case are the City's Charter, its Code of Ordinances, and its Personnel Manual. Each document corroborates the other in setting forth the administrative scheme under which the City operates.

Pursuant to section 9.05 of the City's Personnel Manual, the city manager, Barrett in this case, possesses the "authority to discharge all personnel below him." Section 11.01 of the Personnel Manual, however, states that "if the [city manager's] decision results in discharge, demotion, or loss of pay,

the decision shall include notification to the employee of the employee's right to a post-action hearing." The rules governing post-action hearings are found in section 11.02 of the Personnel Manual and provide that "the post-action hearing officer or personnel review board shall have the power to modify or set aside such discipline." Therefore, even though the authority to decide whether or not to discharge an employee rests with the city manager, the City's Personnel Manual clearly restricts the city manager's powers by expressly providing for a review which may set aside that decision.

The City's Charter reads similarly. Section 4.05(d) provides that the city manager has the authority and duty to "employ, appoint or remove" all city employees below him. Although the city manager may delegate his duty in that regard, "no employee will be hired or removed without the city manager's approval." However, "removed employees [such as Scala] shall have the right to appeal under the provisions of the Civil Service Code." *Id.* Under these terms, the city manager is vested with significant, but not final, decisional authority on issues of initiating, maintaining, or discontinuing one's city employment.

Section 4.05(g) gives the city manager a similar degree of influence in making employment policy. Under that section, the city manager is required to "formulate and review annually a personnel policy *for recommendation* to the city commission dealing with removal policy, discipline policy, and grievance procedures." (emphasis added). Scala argues that only a "tortured" reading of section 4.05(g) could lead one to conclude that the city manager may only recommend personnel employment policy to the commission. (Mem. in Opposition at pg. 13.) To the contrary, the court finds that section 4.05(g) quite clearly restricts the city manager's role in employment policy formulation to that of a recommendation, leaving the final policy making to the city commission. Nothing in the City's Charter, Code of Ordinances, or Personnel Manual suggest anything to the contrary. Under either section 4.05(d) or (g), city manager Barrett's actions with regard to employment issues were reviewable by either the Civil Service Board or the City Commission.

In cases where a local government official's discretionary authority is reviewable by another arm of the local government, courts have consistently held that such an official's authority to make decisions or policy is not final. *E.g., Pearson v. Macon–Bibb County Hosp. Auth.,* 952 F.2d 1274, 1281 (11th Cir. 1992); *Manor Healthcare Corp. v. Lomelo,* 929 F.2d 633, 637–38 (11th Cir.1991); *Mandel v. Doe,* 888 F.2d 783, 794 (11th Cir.1989); *Worsham v. City of Pasadena,* 881 F.2d 1336, 1340–41 (5th Cir.1989); *Williams v. Butler,* 863 F.2d 1398, 1404 (8th Cir.1988). Without final policy-making authority being vested in the official whose actions caused the alleged constitutional deprivation, municipal liability cannot be had. In case at bar, therefore, even if the court were to find that Barrett possessed final decision-making authority on issues of City employment, Scala's claim that Barrett's actions fairly constitute official City policy would nevertheless fail because his decisions, albeit at his discretion, were expressly reviewable and could be vacated. *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299; *accord Martinez v. City of Opa-Locka, Fla.,* 971 F.2d 708, 715–16 (11th Cir. 1992) (Johnson, J., dissenting). Consequently, the court finds that Scala's claim that the City bears legal responsibility for Barrett's actions in the case at bar must fail because Barrett was not a final policy maker whose actions could be fairly said to constitute those of the City. Further, inasmuch as Younger was subordinate to Barrett, his actions similarly cannot constitute City policy in a way that would subject the City to liability. As such, Scala's claim for municipal liability based upon the actions of Younger or Barrett must fail because neither of those City officials retained responsibility "for establishing *final* governmental policy respecting [city employment]." *Pembaur,* 475 U.S. at 482–83, 106 S.Ct. at 1300 (emphasis added).

Scala invoked Section 1983 as the sole procedural gateway to his substantive constitutional claims against the City. Having determined that municipal liability for the deprivations claimed is foreclosed under Section 1983 when based upon the actions of Younger and Barrett as alleged, the court need not reach the merits of Scala's substantive claims.

### III. Conclusion

Under Section 1983, a municipal official who, by his actions, causes constitutional deprivations can create legal liability for the municipality if the official had final policy-making authority for the municipality with respect to the action taken. Without final policy-making authority, the official's actions are not fairly chargeable to the municipality and may not give rise to its liability. In the case at bar, the evidence demonstrated that neither Barrett nor Younger possessed the requisite authority over employment policy to fairly attribute the actions of either to the City of Winter Park. Inasmuch as Scala alleges no alternate theory of municipal liability under Section 1983, the court concludes that Scala has failed to prove an essential element of his case on which he would bear the burden of proof at trial. Further, the court finds that the undisputed facts as well as the reasonable inferences drawn the facts do not create a material issue for trial. Therefore, the court **GRANTS** the City's motion for summary judgment (Doc. 34), and directs the clerk of the court to enter judgment accordingly.